RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

STATE OF ARIZONA; STATE OF MONTANA; STATE OF OHIO,

　　　　　　　　　*Plaintiffs-Appellees*,

　　*v.*

JOSEPH R. BIDEN, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, in his official capacity as Secretary of Department of Homeland Security; TROY MILLER, in his official capacity as Acting Commissioner of United States Customs and Border Protection; TAE D. JOHNSON, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; UR JADDOU, in her official capacity as Director of U.S. Citizenship and Immigration Services,

　　　　　　　　　*Defendants-Appellants*.

No. 22-3272

───────────────

On Motion for Stay.
United States District Court for the Southern District of Ohio at Dayton;
No. 3:21-cv-00314—Michael J. Newman, District Judge.

Argued: April 7, 2022

Decided and Filed: April 12, 2022

Before: SUTTON, Chief Judge; MOORE and COLE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Michael Shih, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Sylvia May Mailman, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON MOTION FOR STAY AND REPLY:** Michael Shih,

Sean R. Janda, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  **ON RESPONSE:** Sylvia May Mailman, Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Drew Curtis Ensign, OFFICE OF THE ARIZONA ATTORNEY GENERAL, Phoenix, Arizona, Christian B. Corrigan, OFFICE OF THE MONTANA ATTORNEY GENERAL, Helena, Montana, for Appellees.

SUTTON, C.J., (pp. 2–17; app. 22–24), delivered the order of the court in which MOORE and COLE, JJ., joined.  SUTTON, C.J. (pp. 18–21), also delivered a separate concurring opinion.

————————————

**ORDER**

————————————

SUTTON, Chief Judge.  Last fall, the Secretary of Homeland Security issued a memorandum to his deputies outlining the Department's immigration enforcement priorities and policies.  Arizona, Montana, and Ohio filed this lawsuit in the Southern District of Ohio to enjoin its implementation.  The district court issued a "nationwide preliminary injunction," applicable to all 50 States, blocking the Department from relying on the priorities and policies in the memorandum in making certain arrest, detention, and removal decisions.  The National Government asks for a stay pending appeal.  For the reasons that follow, we grant the stay.

I.

Federal law gives the National Government considerable authority over immigration policy.  Consistent with its powers under the U.S. Constitution, U.S. Const. art. I, § 8, cl. 4, Congress has enacted several statutes with respect to detention and removal.

As to detention, the Department of Homeland Security "shall take into custody" those "criminal aliens" who are inadmissible or deportable by reason of their having committed certain crimes—including aggravated felonies, firearm offenses, drug crimes, and crimes of moral turpitude—or their having been involved in terrorist activities.  8 U.S.C. § 1226(c)(1). Removable individuals often are in state custody after a state-law conviction.  In such cases, the Department issues a "detainer," a notice to the State that it intends to take custody of the noncitizens upon their release from state custody.  8 C.F.R. §§ 287.7(a), 287.7(d); Immigration and Customs Enforcement Policy No. 10074.2 ¶¶ 2.4–2.6.  The State then informs the

Department of the noncitizens' release date and holds them for up to forty-eight hours to allow the Department to take custody.  8 C.F.R. §§ 287.7(a), 287.7(d).  In other cases, the Department has discretion to have "an alien . . . arrested and detained pending a decision on whether the alien is to be removed from the United States," and even when it decides to do so, it retains discretion to release the individual with certain conditions.  8 U.S.C. § 1226(a).

As to removal, Congress has provided that, "when an alien is ordered removed," the Department "shall remove the alien from the United States within a period of 90 days," except in specified circumstances.  *Id.* § 1231(a)(1)(A).  If, however, removal cannot be accomplished within the removal period, continued detention is not required, and the Department has discretion to release noncitizens under supervision.  *Id.* § 1231(a)(3).

Congress has tasked the Secretary of Homeland Security, currently Alejandro Mayorkas, with establishing "national immigration enforcement policies and priorities."  6 U.S.C. § 202(5).  On September 30, 2021, the Secretary exercised this power by issuing "Guidelines for the Enforcement of Civil Immigration Law."  R.4-1 at 1.  Noting that the Department lacks the resources to apprehend and remove every one of the more than 11 million removable noncitizens in the country, the Secretary explained that the agency would "prioritize for apprehension and removal noncitizens" who fit within three categories:  threats to "our national security, public safety, and border security."  *Id.* at 2–3.  "Whether a noncitizen poses a current threat to public safety," the Guidance says, "is not to be determined according to bright lines or categories," but "requires an assessment of the individual and the totality of the facts and circumstances."  *Id.* at 3.  To that end, the Guidance lists a number of aggravating and mitigating factors that immigration officers should consider.  Aggravators include the gravity and sophistication of the offense, its degree of harm, whether it involved the use of a dangerous weapon, and whether the noncitizen has a serious criminal record.  Mitigators include advanced age or youth, lengthy presence in the United States, conditions requiring care or treatment, and the impact of removal on family in the United States.  The Guidance cautions that the memo does not "compel an action to be taken or not taken," "leaves the exercise of prosecutorial discretion to the judgment of our personnel," and "is not intended to, does not, and may not be relied upon to create any right or benefit."  *Id.* at 5, 7.

On November 18, 2021, eleven days before the Guidance took effect, two States from the Ninth Circuit (Arizona and Montana) and one State from the Sixth Circuit (Ohio) filed this action against the United States, the President, the Secretary, the Department, and other Homeland Security officials (collectively, the Department or the National Government). They filed the complaint in the Southern District of Ohio. Soon after filing the complaint, they requested a preliminary injunction to prevent the Department from implementing the Guidance. From where the claimants stand, the Guidance violates the Administrative Procedure Act on the grounds that it is contrary to law, is arbitrary or capricious, and should have been subjected to notice and comment. The legal centerpiece of their claim is that the Guidance fails to honor 8 U.S.C. § 1226(c), which requires the Department to take custody of certain criminal noncitizens—those convicted of terrorist activities, aggravated felonies, firearm offenses, drug crimes, and crimes of moral turpitude—when they are released from state or federal prison, and 8 U.S.C. § 1231(a), which requires the Department to remove noncitizens within 90 days of receiving final orders of removal. Failure to respect the requirements of the two statutes, the three States claim, has led to fewer detainers and removals, meaning individuals are being released from state custody into their communities and imposing costs and burdens on them: additional costs to pay for medical and educational services and additional law-enforcement burdens given the risks of recidivism.

After rejecting a host of justiciability challenges to the lawsuit and after concluding the Guidance likely violated the Administrative Procedure Act, the district court issued a "nationwide preliminary injunction." The National Government sought emergency relief in this court.

II.

In deciding whether to grant a stay, we ask several interrelated questions: (1) Has the applicant made "a strong showing that he is likely to succeed on the merits"? (2) Would the applicant be "irreparably injured absent a stay"? (3) Would a stay "substantially injure the other parties" in the case? and (4) What does "the public interest" favor? *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation omitted). We start, and largely end, with the likelihood-of-success inquiry.

*Constitutional standing.*   Article III of the U.S. Constitution permits federal courts to adjudicate only "cases or controversies," not any political dispute that happens to arise between the state and federal executive branches.  To have standing to bring this lawsuit, the States must show that they have suffered an "injury in fact" "caused" by the Guidance that a favorable decision would "redress."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992).  When a claimant challenges the National Government's actions with respect to third parties (here, the regulation or not of noncitizens), it is "substantially more difficult" to establish standing given the causation and redressability problems that invariably arise.  *Id.* at 562 (quotation omitted).

In trying to meet these requirements, the trio of States points to monetary harms allegedly caused by the Department's failure to enforce the immigration laws more vigorously.  Their key concern is that the Department's prioritization of some risks—public safety, terrorism, and border security—will come at the expense of other statutory priorities.  They worry in particular that the Guidance will decrease the number of noncitizens detained and removed and will shortchange efforts to detain and remove those convicted of drug crimes and crimes of moral turpitude, all with downstream costs to the States in the form of additional crime and public-welfare costs.  But considerable speculation undergirds this claim.

As for injury, start with the reality that the Guidance does not directly injure the States.  It does not regulate the States by telling them what they can or cannot do in their jurisdiction.  And it does not purport to preempt any state or local law, whether criminal or otherwise.  State criminal sentences, for example, may be as long as each State wishes.  The Guidance merely tells federal employees what to prioritize in enforcing a federal law over which the Supreme Court has said that the National Government has considerable, indeed often exclusive, authority.  *See Arizona v. United States*, 567 U.S. 387, 394–97 (2012).

It also is speculative whether and how the Guidance's prioritization of the apprehension and removal of noncitizens in the three States will injure each of them.  That the National Government decides to remove or detain person A over person B does not establish that it will pursue fewer people, particularly with respect to a Guidance that never *requires* agents to detain some noncitizens over others.  Because the Guidance prioritizes the noncitizens with the greatest risks to public safety, it also is hard to know whether fewer detentions and removals means more

injuries to States even on their own terms. Once one accounts for the twin realities that there are many noncitizens that are illegally in the three States and that the Guidance permissibly does not regulate what to do with those individuals, is it not possible that the Guidance's focus on public safety, border security, and terrorism will decrease burdens on the States? Hypothetical possibilities, especially those arising from the impact of regulations on third parties not before the Court, often do not make for a case or controversy. *Lujan*, 504 U.S. at 562–63.

The States' asserted injuries also "hinge on the response" of individual immigration officers to the Guidance. *Id.* at 562. Even if the Guidance places some process limits on how the officers exercise discretion to pursue action against certain people, the States do not dispute that the officers retain control over the volume of removals and detentions they effect. If an injury turns on choices made by others and if those choices permit considerable "discretion," the States have a burden to show "those choices have been or will be made." *Id.* (quotation omitted); *see Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam) ("Any prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time.") (quotation omitted).

Even the premise that the Guidance has coincided with a fall in immigration enforcement overall does not lead to the conclusion that the Guidance is the culprit, let alone the challenged portion of the Guidance. Other explanations exist. The National Government's main enforcement authority affecting noncitizens within a State after all has little to do with detention and removal decisions at the back end. It has to do with prosecutorial discretion at the front end when immigration agents and law enforcement decide whom to arrest and whom not to. The States do not challenge this classic form of prosecutorial discretion, and the consequential exercise of discretion when it comes to noncitizen populations in Arizona, Montana, and Ohio. *See Texas v. United States*, 14 F.4th 332, 337 (5th Cir.), *vacated*, 24 F.4th 407 (5th Cir. 2021) (en banc). Even if the injunction remained in place—in other words, if the Guidance were removed—that would not necessarily result in the Department arresting more people, detaining more people, or removing more people.

The States protest that the district court found that they would sustain these costs, emphasizing that we review factual findings for clear error. True, the district court found that a

downward trend in removals under the Guidance could increase expenditures. But true or not, this conclusion still runs into these same causation and redressability problems. The district court did not connect the dots between the decrease in removals and the Guidance's challenged prioritization. Given the Department's unrebutted statements that the Guidance reflects longstanding application of this 1996 statute, it is difficult to show that the Guidance has made the difference. The court's fact finding might survive review, but its materiality may not.

The States dispute the Department's portrayal of the Guidance as mere prioritization. In their view, it prohibits officials from arresting or removing certain people. But nothing in the Guidance, to repeat, prohibits a single agent from detaining or removing a single person or for that matter any category of noncitizens identified in the two statutes.

Even if the States cannot meet Article III's "irreducible" standing requirements, *Lujan*, 504 U.S. at 560, they disclaim any need to do so. In their view, *Massachusetts v. EPA*, 549 U.S. 497 (2007), relaxed the Constitution's standing requirements if the litigant is a sovereign. There is something to the point but not as much as the States make of it. Start with what *Massachusetts v. EPA* does not say. It does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability. Think of it this way. Had the States of Arizona, Montana, and Ohio challenged the Secretary of the Interior's reprioritization of activities to protect endangered species in *Lujan* itself, it is difficult to believe that the Court would have found the injuries any less speculative or conjectural in terms of causation and redressability. In that sense, Article III's foundational standing requirements remain for private and public litigants alike.

What *Massachusetts v. EPA* does show is that States are entitled to "special solicitude" in this area because they may incur "quasi-sovereign" injuries that private parties cannot. *Id.* at 517–20. While the States may have more theories of injury available to them, that does not allow them to bypass proof of injury in particular or Article III in general. *Saginaw County v. STAT Emergency Med. Servs.*, 946 F.3d 951, 957 (6th Cir. 2020).

The States' alleged injuries in this case do not appear to fall within *Massachusetts v. EPA*'s compass. They do not protest regulation of them as States or preemption of local

lawmaking authority. They do not protest any threatened incursions on their territory, as in *Massachusetts*. And they do not involve the "classic" sovereign case, "public nuisances," where a State invokes a desire "to safeguard its domain and its health, comfort and welfare." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022) (quotation omitted); *see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602 (1982).

Their main objection is to indirect fiscal burdens allegedly flowing from the Guidance. But why would that humdrum feature of a regulation count as a uniquely sovereign harm? Most regulations have costs. A State has no more reason to fear harms to its bottom line from federal regulations than a person or a business does. *Massachusetts v. EPA* itself relied on authority that distinguished quasi-sovereign interests from those "capable of estimate in money." 549 U.S. at 518–19 (quotation omitted). Are we really going to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court?

The States also assert that their interest in excluding people who have no right to be in their territory is a quasi-sovereign injury that entitles them to special solicitude under *Massachusetts v. EPA*. But even if a State can be distinguished from a private entity in this way and even if we put to the side that the key sovereign with authority and "solicitude" with respect to immigration is the National Government, not the States, *see Arizona*, 567 U.S. at 394–97, that does not liberate the States from establishing causation and redressability. The States express their injury in terms of rising costs from crime and public services associated with playing host to more noncitizens. When defined in terms of the costs of crime, the States' injury fails to satisfy *Lujan*. How can we assume at this stage of the case that prioritizing apprehension of immigrants who pose a threat to "public safety" will drive up the States' criminal populations? 504 U.S. at 565–67. A theory of injury grounded in rising crime rates seems like it would "hinge" on third parties committing more crimes. *Id.* at 562. As for the increased cost of public services, that requires showing, as noted, that the Guidance would be the cause. Even under *Massachusetts*, there are many dubious justiciability questions with respect to the States' theory of standing—enough for us to be skeptical at this stage of the case that they can bring the action.

*Reviewability.* We also doubt that the Guidance is reviewable under the Administrative Procedure Act. It generally allows anyone "adversely affected or aggrieved by agency action" to seek judicial review. 5 U.S.C. § 702. Even if we assume for the sake of this argument that the Guidance has "adversely affected" the three States, the Act permits federal courts to review only "final agency action." *Id.* § 704. To qualify, the action must (1) "mark the consummation of the agency's decisionmaking process" and (2) be an action "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quotation omitted). The Guidance counts as the consummation of the Department's decisionmaking, as all sides agree. Today's dispute turns on the second inquiry.

We have some guidance and sharpening inquiries of our own on this point. Will the agency's action "impose liability" on a regulated party, create legal rights, or "mandate, bind, or limit other government actors" in the future? *Parsons v. U.S. Dep't of Just.*, 878 F.3d 162, 169 (6th Cir. 2017). And will the agency's action have "a sufficiently direct and immediate impact on the aggrieved party and a direct effect on its day-to-day business"? *Berry v. U.S. Dep't of Lab.*, 832 F.3d 627, 633 (6th Cir. 2016) (quotation omitted). If an action maintains officials' "independent decisonmaking" and can be "discretionarily relied on," it likely lacks legal effect. *Parsons*, 878 F.3d at 170. Through it all, we will not overlook whether the agency's action puts a party to a "Catch-22," stuck between heavy compliance costs or feared liability, neither of which can be undone. *Air Brake Sys. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004).

Viewed through the lens of these "legal effect" considerations, the Guidance likely is not reviewable. Start with the revealing language of its action: "Guidelines for the Enforcement of Civil Immigration Law." "Guidelines" do not evoke binding legal effect. Consistent with its label, the Guidance couches its instructions on lots of conditional language that preserves officials' discretion. The document provides a "not exhaustive" list of factors as "example[s]" of what officials should consider. R.4-1 at 3–4. It allows officials to make decisions "depending on the facts." *Id.* at 4. It cautions that it "does not compel an action to be taken or not taken" but "leaves the exercise of prosecutorial discretion to the[ir] judgment." *Id.* at 5. Even when the Guidance uses the word "requires," it does so in the context of "an assessment of the individual

and the totality of the facts and circumstances." *Id.* at 3.  Capping it off, the Guidance makes clear that it "is not intended to, does not, and may not be relied upon to create any right or benefit." *Id.* at 7.  This has the telltale signs of a non-binding policy statement, not of reviewable agency action.

Neither does the Guidance place the States in a regulatory Catch-22.  Whatever costs the Guidance creates for the States downstream arise only from officials who exercise their discretion under the Guidance, confirming that those costs are not the Guidance's "direct or appreciable legal consequences." *Parsons*, 878 F.3d at 170.  For similar reasons, the Supreme Court held that the base-closing commission's recommendations (which the President had to accept or reject) lacked finality because they were *not* the "action that will directly affect the military bases." *Dalton v. Specter*, 511 U.S. 462, 469 (1994) (quotation omitted).  Even if the Guidance creates some still-to-be-determined costs for the three States, it is well to remember that "adverse economic effects accompany many forms of indisputably non-final government action." *Air Brake Sys.*, 357 F.3d at 645.

It may be true that agency action under the Administrative Procedure Act is presumptively reviewable. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2567 (2019).  But the opposite is true for "[r]efusals to take enforcement steps." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  An agency's choice "not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed" to an agency's "discretion." *Id.*  No doubt, that approach does not apply when Congress, as opposed to the agency, sets all of the marching orders. *Id.* at 834.  But as shown above and below, Congress did not remove all discretion from the Department in making removal and detention decisions.

The States call our attention to the Guidance's section that explains that it "will become effective in sixty (60) days" and that all "agency leaders . . . will implement this guidance accordingly."  R.4-1 at 6–7.  The same would be true for any non-binding policy statement.  Everything has a beginning and an end.  Just as this interpretive and policy Guidance brings an end to the former set of guidelines—"rescind[ing]" the prior interim guidance, *id.* at 6—this Guidance surely will be modified at some point, whether with this administration or a future one.

The existence of effective dates does not tell us whether the Guidance has the kind of legal effect that makes it reviewable.

In like vein, the States point to training to implement the Guidance, the transfer of agents to the border under it, and the goal of producing uniformity in practice, all of which (they claim) show that the Guidance will have a greater impact than its flexible and no-legal-effect language suggests. But any policy statement could, indeed likely would, lead to training, reprioritization of employees, and uniformity. All of this amounts to the kind of "practical consequences" that come with most policy statements as opposed to the "direct and appreciable legal" consequences that come with agency rules and other reviewable agency action. *Parsons*, 878 F.3d at 170.

Confirming that the Guidance lacks legal effect is the reality that it is difficult to see how any noncitizen—or any person at all—could invoke it to establish legal protection. We are not aware of any such instance with respect to the Guidance or its prior incarnations. The States claim that a Minnesota district court habeas case shows otherwise. But that is not true. In *Hussein v. Garland*, a detainee sought release because his liberty interests were violated by prolonged detention when it was unlikely he would be removed soon. No. 21-348, 2021 WL 1986125, at *1 (D. Minn. May 18, 2021). The court concluded that, because the conflict in Ethiopia had "rapidly intensified" and introduced "additional uncertainty into the timeline," his removal was "not likely in the reasonably foreseeable future." *Id.* at *2–3. After the court made that dispositive finding, it noted that the petitioner was not in the "priority groups" of the interim guidance, "[f]urther" suggesting his "removal is unlikely to be imminent." *Id.* at *3. That the Guidance, like a policy statement, might predict future government action does not make it binding.

Nor does the "legal effect" inquiry turn on whether it controls employees of the Department. Else, all administrative policy interpretations of federal laws, even those filled with "totality of the circumstances" discretion, would be reviewable.

What of the possibility that we should be skeptical in the other direction—that we should consider the possibility that the Department labeled its directive "Guidance" in order to avoid review of these policies. Labels, it is true, do not control the inquiry. Legal effects do. But the

combined realities that the relevant statutes have many moving parts, the Guidance leaves considerable discretion in implementing it, and the Guidance does not create any legal rights for noncitizens all suggest it is not reviewable.

### III.

Even if the States cleared these first two hurdles, we have initial doubts about the merits of the States' arguments that the Guidance violates the Administrative Procedure Act on the grounds that it is contrary to law, is arbitrary or capricious, and lacks notice and comment. 5 U.S.C. §§ 706(2), 553. We address these questions despite our initial doubts about standing and reviewability given the predictive nature of the likelihood-of-success inquiry at this early stage.

*Contrary to law*. The States allege the Guidance violates detention and removal instructions in two immigration statutes by compelling officers to consider a host of factors before making decisions that Congress made mandatory and precluded from turning on multiple immigration-policy considerations. As the States emphasize, federal law "*requires*" the Department "to arrest and remove certain aliens," but the Guidance lets officers do so only after they "determine that arrest or removal is justified by a set of extra-statutory factors." State Br. 14.

But this claim must account for the considerable discretion already baked into the immigration system. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Those officials, "as an initial matter, must decide whether it makes sense to pursue removal at all." *Id.* There are "various stages in the deportation process," and "[a]t each stage the Executive has discretion to abandon the endeavor." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). All of this explains why Congress has charged the Department with "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

The question is not whether 8 U.S.C. §§ 1226(c) and 1231(a) have mandatory language. It is whether this mandatory language displaces the Department's longstanding discretion in enforcing the many moving parts of the nation's immigration laws. We think it unlikely that

either statute creates a judicially enforceable mandate that the Department arrest or remove certain noncitizens.

Look first at 8 U.S.C. § 1226(c)(1).  It provides that the Department "shall take into custody any alien who" is removable for specified reasons (including those convicted of crimes with respect to terrorism, aggravated felonies, firearms, drugs, and moral turpitude) "when the alien is released," presumably meaning released from state or federal custody for a qualifying offense.  8 U.S.C. § 1226(c)(1).  Two problems undercut the bright line, judicially enforceable rule that the States claim § 1226(c)(1) creates.  One turns on the reality that, by prioritizing efforts to prevent terrorism, to protect public safety, and to ensure border security, the Guidance does not necessarily violate a single word of the statute.  After all, the identified crimes all fit within the category of ensuring public safety and protecting against terrorism.  Nor is it problematic to prioritize anti-terrorism by name.  Nothing seems to prevent the Department from taking the five categories of crime and saying we will prioritize not-unlimited detention and removal resources in the order of these crimes:  terrorism, aggravated felonies, firearm offenses, drug offenses, and moral turpitude offenses.  This would not be the first administration to use triage in enforcing immigration laws.

The second problem is that, while the provision says that the Department must take certain people, including the ones that commit these crimes, into custody, it does not say how long they must remain in custody or even ensure they must immediately be taken into custody.  Keep in mind that this binding duty applies "pending a decision on whether the alien is to be removed."  *Id.* § 1226(a).  Immigration authorities, as the Supreme Court has made clear, have considerable discretion over whom to arrest and remove.  *Arizona*, 567 U.S. at 396.  That means the Department does not necessarily have an obligation to take a noncitizen into custody, or keep them in custody, if they decide at that point or later on not to bring an enforcement action.  At that point, there would no longer be a "pending . . . decision on whether the alien is to be removed."  8 U.S.C. § 1226(a).

Move to 8 U.S.C. § 1231(a)(1)(A).  "Except as otherwise provided," it says that, "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."  *Id.*  But Congress itself appreciated that removal would not always

occur within 90 days. It permitted supervised release—release from custody—"[i]f the alien does not leave or is not removed within the removal period." *Id.* § 1231(a)(3). Combined with the basic principle that "[a]t each stage" of the removal process, "the Executive has discretion to abandon the endeavor" to remove someone, *Reno*, 525 U.S. at 483, all of this means that immigration officials retain some measure of discretion not to execute a final order of removal within 90 days. That explains why the Supreme Court expressed "doubt" that, "when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time." *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Which Presidential administration since this law came into effect in 1996, it is fair to wonder, has come close to removing all eligible noncitizens within 90 days, whether with respect to statutorily permitted reasons or not?

Even so, both statutes say "shall," the States insist, connoting a command, particularly when contrasted with the use of "may" elsewhere in both statutes. But the use of "shall" does not automatically create a judicially enforceable mandate, especially when criminal or civil law enforcement is at issue. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761–62 (2005) (statute saying that officers "shall arrest" did not eliminate police discretion whether to arrest a violator). "[C]ommon sense" dictates that law enforcement officers generally retain "deep-rooted" discretion "even in the presence of seemingly mandatory legislative commands." *Id.* at 761 (quotation omitted). Even an "express statutory deadline" does not necessarily mean "Congress intended for courts to enforce the deadline." *See Nielsen v. Preap*, 139 S. Ct. 954, 969 n.6 (2019); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993). We see no "stronger indication" from Congress in these statutes that "shall" creates a judicially enforceable mandate. *Castle Rock*, 545 U.S. at 761. The context in fact cuts the other way. There are many moving parts in immigration law, and we doubt these laws eliminate the Department's discretion to decide whom to charge, whom to remove, and when to do so.

The States, moreover, have a juxtaposition problem of their own. Another provision, 8 U.S.C. § 1231(a)(2), says that, "[d]uring the removal period, the Attorney General shall detain the alien. *Under no circumstance* during the removal period shall the Attorney General release an alien who has been found inadmissible" for the same types of offenses captured by § 1226(c).

(emphasis added.)  Notably, the States do not complain that the Guidance violates this provision, and the Department acknowledges that it must follow this under-no-circumstance directive. Having argued that the juxtaposition between the "may" and "shall" language in the two statutes supports it position, the States must acknowledge that the juxtaposition between the "shall" and "under no circumstance" language supports the Department's position.

Not every "shall" directive in a federal immigration statute, it turns out, necessarily creates a judicially enforceable mandate.  That is in part because the Executive Branch has considerable enforcement discretion in deploying limited resources to address its policy challenges.  And that is in part to preserve bedrock separation of powers.  It takes little imagination to envision the difficulty the Judicial Branch would face in trying to ensure that immigration officers enforce federal laws like these just the way some States would like them to. If it is fair to worry from time to time about the risks when executive-branch agencies exercise legislative and judicial power, it is equally fair to worry when judges are called into disputes that turn principally on policy and resource debates between the First and Second Branches.

*Arbitrary or capricious*.  The APA requires that "agency action be reasonable."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Review is "deferential," and "a court may not substitute its own policy judgment for that of the agency."  *Id.*  We seek merely to ensure that the agency considered relevant data points and offered a satisfactory explanation for its decision.  *Id.*  At this early stage, we cannot say that the Department failed to address relevant concerns or explain itself.  The agency considered the problem of recidivism.  It explained that the Guidance's call for context-specific consideration of a noncitizen's circumstances is meant to assess "whether a noncitizen poses a current threat to public safety, including through a meaningful risk of recidivism."  R.27-2 at 12.  The agency also considered the effect of its Guidance on the States.  Its Considerations Memo includes an "Impact on States" section in which it reasoned that the Guidance's fiscal impact on States "would vary based on a range of factors," is "difficult to quantify," and might be offset at least in part by cost savings for States due to the "implementation of priorities guidance" aimed at public safety threats.  *Id.* at 15–16. The States do not suggest that the agency had to calculate the costs of its Guidance on States, and

the States themselves have not offered any concrete evidence of the Guidance's fiscal effects on each of them.

The Secretary also offered a satisfactory explanation for the priorities. He emphasized that the Department needs to "make smart and strategic choices about how to utilize" limited resources in enforcing the nation's immigration laws. *Id.* at 5–6. And he added that the Department's mission "is not best served by simply pursuing the greatest overall number of enforcement actions but is rather best advanced by directing resources to prioritize enforcement against those noncitizens who most threaten the safety and security of the Nation." *Id.* at 17. This was not arbitrary or capricious—at least not likely so at this stage of the case.

*Notice and comment*. The Guidance did not need to go through notice and comment. By statute, that requirement does not apply to "general statements of policy," 5 U.S.C. § 553(b)(A), which include "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quotation omitted). This Guidance fits that bill.

True, an agency cannot avoid procedural requirements via a self-serving label, calling something a "policy" or "guidance" when it amounts to a legislative rule. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019). The content of the agency's action, not its name, shapes the inquiry. *Id.* But, to repeat, the Guidance "does not compel" any action, "leaves the exercise of prosecutorial discretion to the judgment of" federal personnel, and does not create any "right or benefit . . . enforceable at law." R.4-1 at 5, 7. It does not bear the hallmarks of a substantive rule because it does not legally "affect[] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (quotation omitted).

IV.

The other factors favor a stay as well. The preliminary injunction likely causes irreparable harm to the Department by interfering with its authority to exercise enforcement discretion and allocate resources toward this administration's priorities. A stay pending appeal should not substantially injure the three States. Yes, if they are right, the Guidance may impose costs on them that are difficult to recover. But the extent of those costs is filled with ifs and

maybes, particularly given the reality that the States concede that the relevant federal statutes do not tell the Department how to deploy its resources, do not stop it from setting prioritization categories, and do not prevent it from sending its enforcement agents wherever it wishes. If federal law permits all of that, it is hard to see how lifting the injunction pending appeal will result in substantial and distinct injuries to the three States. In view of our doubts about the States' claims under the Administrative Procedure Act, the public interest favors a stay. Most of the States' contrary arguments pivot on the assumption that the Guidance is illegal, an assumption that we have not found persuasive thus far. All in all, the stay scale tips in the National Government's favor, especially given the reality that we will expedite resolution of this appeal, minimizing any risk of substantial injury to the States in the interim.

Given the many intricate issues implicated by the district court's lengthy opinion—including standing, administrative reviewability, the proper interpretation of the statutes, and the statutes' limitations on Executive Branch discretion—we will expedite the appeal of the preliminary injunction. The clerk is directed to enter an expedited briefing schedule. The National Government must file its principal brief within three weeks from this order's entry. The States will have three weeks to respond. The National Government will then have ten days to reply. Oral argument will be scheduled for June 10, 2022, and we will strive to resolve this appeal within the next three months.

———————————

## CONCURRENCE

———————————

SUTTON, Chief Judge, concurring.  What we have said so far, as I see it, should be taken with a grain of adjudicative salt.  Imperatives of speed in decisionmaking—less than a week since the last brief was filed—do not always translate into accuracy in decisionmaking.

The district court's remedy—universally enjoining the National Government from enforcing the Guidance in any State in the country—also likely exceeded its authority.  I do not take issue with the court's decision to extend the remedy beyond the Southern District of Ohio as to the three state claimants.  When "exercising its equity powers," a district court "may command persons properly before it to cease or perform acts outside its territorial jurisdiction." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952).  But it is one thing to honor a federal court judgment issued in favor of, say, Arizona by the Southern District of Ohio anywhere in the country.  It is quite another to do so for the 47 States that did not participate in the lawsuit.  I am not the first to question nationwide (or universal) injunctions (or remedies) that bar the federal government from enforcing a law or regulation anywhere and against anyone.  *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas J., concurring); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599–601 (2020) (mem.) (Gorsuch, J., concurring); *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 256–63 (4th Cir. 2020) (vacated on other grounds); Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 457–82 (2017).

I meet this concept with considerable skepticism.  Article III grants the "judicial Power," which extends only to specified "Cases" and "Controversies."  U.S. Const., art. III, § 2.  Standing limitations, a prohibition on advisory opinions, distinctions between judgments and opinions all grow out of this language and the history behind it.

The same is true of remedies, which emerge from a federal court's equitable power.  A valid Article III remedy "operate[s] with respect to specific parties," not with respect to a law "in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quotation omitted).  That is

why courts generally grant relief in a party-specific and injury-focused manner. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). In this same way, we do not remove—"erase"—from legislative codes unconstitutional provisions. Jonathan Mitchell, *The Writ–of–Erasure Fallacy*, 104 Va. L. Rev. 933, 1016–17 (2018). We merely refuse to enforce them in a case, thereby exercising "the negative power to disregard an unconstitutional enactment." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). After a court has remedied a claimant's injury, it is fair to ask what controversy remains for a court to adjudicate or remedy.

Call them what you will—nationwide injunctions or universal remedies—they seem to take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting toward nonparties in the case. The law already has a mechanism for applying a judgment to third parties. That is the role of class actions, and Civil Rule 23 carefully lays out the procedures for permitting a district court to bind nonparties to an action. Nationwide injunctions sometimes give States victories they did not earn and sometimes give States victories they do not want. They always sidestep Rule 23's requirements.

Such injunctions create practical problems too. The effect of them is to prevent the National Government from enforcing a rule or executive order without (potentially) having to prevail in all 94 district courts and all 12 regional courts of appeals. They incentivize forum shopping. They short-circuit the decisonmaking benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top. They lead to rushes to judgment. And all of this loads more and more carriage on the emergency dockets of the federal courts, a necessary feature of any hierarchical court system but one designed for occasional, not incessant, demands for relief.

At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government. Even if it turns out that the three States in this case are entitled to relief, it is difficult to see why an injunction applicable only to them would not do the trick.

The States' contrary arguments are unconvincing. The Administrative Procedure Act, it is true, says that a reviewing court may "hold unlawful and set aside" agency actions that violate the law. 5 U.S.C. § 706(2). But that raises a question; it does not answer it. The question is whether Congress meant to upset the bedrock practice of case-by-case judgments with respect to the parties in each case or create a new and far-reaching power through this unremarkable language. We presume that statutes conform to longstanding remedial principles. *Nken v. Holder*, 556 U.S. 418, 433 (2009); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). And it is far from clear that Congress intended to make such a sweeping change. *Compare* Bray, *supra*, at 438 n.121; *and* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. Reg. Bull. 37, 41–47 (2020); *with* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1191–92 (2020). Use of the "setting aside" language does not seem to tell us one way or another whether to nullify illegal administrative action or not to enforce it in the case with the named litigants. For that reason, I would be inclined to stand by the long-understood view of equity—that courts issue judgments that bind the parties in each case over whom they have personal jurisdiction.

The district court separately feared that a narrower injunction "would create a patchwork immigration enforcement system," R.44 at 78, instead of a "comprehensive and unified" one, *Arizona v. United States*, 567 U.S. 387, 401 (2012). But that justification lacks a limiting principle and would make nationwide injunctions the rule rather than the exception with respect to all actions of federal agencies. That is especially troubling in the domain of immigration law, where the federal Legislative and Executive Branches, not the Judicial Branch, are the key drivers of national policy.

What of the district court's and States' fears that "aliens that DHS illegally fails to arrest or remove can travel" anywhere, making universal relief necessary to "fully redress the States' injuries"? R.34 at 40. That argument, again, would permit a nationwide injunction for any immigration-related claim by any one State. No less importantly, the States have not offered any evidence to back up the point or to concretely illustrate its consequences. Even if this alleged injury were not speculative, it is doubtful that a nationwide remedy was the narrowest way to cure it. Relatedly, the district court worried that the Guidance could not "be applied on a state-

by-state basis." R.44 at 78. But that is initially the National Government's problem, not ours, and it indeed acknowledged that severed policy enforcement remains a feasible alternative.

All in all, nationwide injunctions have not been good for the rule of law. Left unchecked, such nationwide injunctions have become a springing easement on the customary deliberative process for dealing with issues of national importance. The sooner they are confined to discrete settings or eliminated root and branch the better.

ENTERED BY ORDER OF THE COURT

_____

Deborah S. Hunt, Clerk

————————————

**APPENDIX**

————————————

**8 U.S.C § 1226 - Apprehension and detention of aliens.**

(a)  Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.  Except as provided in subsection (c) and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

(b) Revocation of bond or parole

The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

**8 U.S.C § 1231 - Detention and removal of aliens ordered removed.**

(a) Detention, release, and removal of aliens ordered removed

(1) Removal period

(A) In general

Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

(B) Beginning of period

The removal period begins on the latest of the following:

(i) The date the order of removal becomes administratively final.

(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

(C) Suspension of period

The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

(2) Detention

During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title.

(3) Supervision after 90-day period

If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. The regulations shall include provisions requiring the alien—

(A) to appear before an immigration officer periodically for identification;

(B) to submit, if necessary, to a medical and psychiatric examination at the expense of the United States Government;

(C) to give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate; and

(D) to obey reasonable written restrictions on the alien's conduct or activities that the Attorney General prescribes for the alien.